**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ROBIN L. CARTER,                                 :
                                                 :
                              Plaintiff,          :        C.A. No. 07-816-GMS-MPT
                                                 :
            v.                                   :
                                                 :
MICHAEL J. ASTRUE,                               :
Commissioner of Social Security,                 :
                                                 :
                              Defendant.          :

**REPORT AND RECOMMENDATION**

**Introduction**

Robin Carter ("plaintiff") filed this action pursuant to 42 U.S.C. § 1383(c)(3)

against Michael J. Astrue, Commissioner of Social Security ("defendant"), on December

14, 2007.  Plaintiff seeks judicial review under 42 U.S.C. § 405(g) of the final decision

by the Social Security Administration denying her request for supplemental security

income ("SSI") under the Social Security Act ("SSA").[1]  Currently before the court are

the parties' cross motions for summary judgment.  For the reasons stated below, the

court recommends that plaintiff's motion for summary judgment be denied, and that

defendant's cross-motion for summary judgment be granted.

**Procedural Background**

On June 1, 2004, plaintiff filed an application for SSI asserting that she had been

disabled since March 12, 2002 due to a number of ailments.  Plaintiff's claim was

denied initially on December 17, 2004 and again upon reconsideration on April 11,

2005.

---

[1] *See* 42 U.S.C. §§ 1381 *et seq.*

Plaintiff, with the assistance of counsel, requested a hearing before an administrative law judge ("ALJ") which occurred on February 23, 2006.  At the hearing, plaintiff, her mother, and her boyfriend testified as to plaintiff's condition.  In addition, Mitchell Schmidt, an impartial Vocational Expert ("VE"), was present at the hearing and also testified.

On September 12, 2006, the ALJ found that, based on the hearing testimony and the record, plaintiff was not disabled and, therefore, not eligible for SSI.  The Appeals Council subsequently denied plaintiff's request to review the ALJ's decision.  Thereafter, plaintiff brought this present action seeking judicial review of the ALJ's determination.

**Background**

Plaintiff was 43 years old at the time she filed her application for SSI on June 1, 2004.  Plaintiff has an 11th grade education and may have been enrolled in special education classes while in school.  Between 1988 to 2001, plaintiff was employed in retail, construction, factories, and restaurants.[2]  In her application, plaintiff claimed that she has not worked since December 30, 2001, and that multiple impairments caused her to become disabled on March 12, 2002.  Plaintiff listed "emphyzema [sic]; carpal tunnel; disk problems; [ADHD]; [and] arthritis" as her disabling conditions.

### A. Medical Evidence of Plaintiff's Physical Ailments

Plaintiff's medical records span from January 2003 to March 2006.  During that time, she was under the care of Dr. Islam Al-Juanidi, M.D., a physician at Christiana

---

[2] Plaintiff's longest job was a nine-year position as a waitress that entailed taking orders, serving food and drinks, and working the register.  Her last occupation was as a deli worker where she prepared sandwiches.  Plaintiff testified that she stopped working because of transportation difficulties.

Care Health Services, for her chronic obstructive pulmonary disease ("COPD") and gastroesophageal reflux disease ("GERD").  In July 2003, plaintiff began complaining of right shoulder and arm pain.  On July 23, 2003, Dr. Al-Januaidi prescribed Percocet for the right shoulder pain, in addition to Combivent, Bextra, Albuterol, DuoNeb nebulizer, Prevacid, and Advair for plaintiff's COPD, dyslipidemia, high blood pressure, dyspepsia/GERD, and alcohol abuse.  An MRI taken of her right shoulder the following day was "unremarkable."

Plaintiff also began consulting Dr. Glen Rowe, D.O., an orthopedic physician, on August 20, 2003 for her right shoulder pain.  Dr. Rowe reviewed x-rays of plaintiff's cervical spine taken on that day and diagnosed cervical thoracic strain, despite noting that her cervical spine appeared normal.  Dr. Rowe also prescribed Percocet for pain and recommended physical therapy.  Upon returning to his office on September 3, 2003, Dr. Al-Junaidi diagnosed plaintiff as disabled for three months due to her right shoulder pain.

On September 22, 2003, plaintiff returned to Dr. Rowe for back and neck pain, in addition to right shoulder pain.  Dr. Rowe reviewed an MRI of her cervical spine, which revealed a left-sided disc protrusion at the C3-4 level, an annular disk bulge at C5-6, and a central disk herniation at C6-7.  Dr. Rowe referred plaintiff to Dr. Ganesh Balu for possible reflex sympathetic dystrophy ("RSD") and for an electromyography test ("EMG").  On November 10, 2003, Dr. Rowe saw plaintiff again for right arm pain and reviewed the report on the EMG performed on October 2, 2003.  Dr. Balu's EMG report revealed mild to moderate bilateral carpal tunnel syndrome, with the right worse than left.  Dr. Rowe again referred plaintiff to Dr. Balu for more testing and another EMG.  Dr.

3

Rowe also prescribed Flexeril and Neurontin.  On December 29, 2003, plaintiff followed up with Dr. Rowe regarding her right shoulder and upper arm pain.  Plaintiff informed Dr. Rowe that Dr. Balu had diagnosed RSD and was treating her for that condition.

On January 15, 2004, plaintiff had a second EMG-NCV study for right hand pain and numbness.  That study revealed an abnormal EMG and indicated bilateral mild carpal tunnel syndrome and mild sub-acute C5-6 radiculopathy on right.  When compared to the EMG performed in October 2003, "minimal worsening" of the bilateral mild carpal tunnel syndrome was noted.

During an office visit on January 31, 2004, plaintiff complained that her condition was worse and she suffered from constant arm pain.  Dr. Rowe noted an odor of alcohol emanating from plaintiff that day.  Upon examination, Dr. Rowe found that plaintiff was "very, very sensitive to very light touch."  He referred her to Dr. Stephen Penny, a neurologist, for a second opinion regarding her causalgia.  During an office visit on March 29, 2004, Dr. Penny concluded that plaintiff's "one-year history of neck, bilateral arm pain and sensory symptoms" were caused by both carpal tunnel syndrome and cervical radicular disease.  He also suggested that plaintiff's pain could be musculoskeletal.  Dr. Penny recommended conservative therapy before plaintiff underwent a surgical release for the carpal tunnel.

Plaintiff saw Dr. Rowe on April 13, 2004 complaining of increased pain in her arm.  Dr. Rowe diagnosed a ganglion cyst on plaintiff's right wrist and prescribed Vitamin B and continued Neurontin.  On April 29, 2004, plaintiff told Dr. Al-Januidi that she had knee pain.  Dr. Al-Januidi administered a Depo-Medrol injection which plaintiff claimed did not help.  At a follow-up appointment with Dr. Rowe on May 10, 2004,

4

plaintiff's symptoms included persistent right wrist pain and knee problems. Dr. Rowe recommended cervical epidurals to relieve the hand numbness, but discouraged a carpal tunnel release at that time. On May 12, 2004, plaintiff returned to Dr. Al-Junaidi for knee pain and visible bruising on her back. X-rays taken that day revealed normal left ribs and normal bone density.

On June 8, 2004, plaintiff underwent another MRI of her cervical spine as a result of her complaints of right hand numbness and bilateral lower extremity weakness. The MRI confirmed multi-level degenerative cervical disk changes, focal left disk protrusion at both C3-4 and C6-7 (resulting in a compromise of the left nerve root canal at both levels), and mild disk bulges at C4-5 and C5-6. Dr. Rowe reviewed the MRI with plaintiff on June 28, 2004 and prescribed anti-inflammatory medications and Ultram for her pain. Plaintiff continued treatment with Dr. Al-Junaidi for her knee pain through October 2004.

On September 24, 2004, plaintiff underwent a physical residual functional capacity ("RFC") assessment by a Disability Determination Services physician. The RFC indicated that plaintiff could occasionally lift 10 pounds, stand or walk for at least 2 hours in an 8-hour workday, sit 6 hours in an 8-hour workday, and frequent bilateral use of her upper and lower extremities. The assessment also concluded that plaintiff had limited use of her upper extremities for reaching, handling, and fingering. Plaintiff's environmental limitations included moderate exposure to fumes, odors, dusts, gases, and poor ventilation, and concentrated exposure to extreme cold and heat, and wetness and humidity.

On January 17, 2005, plaintiff mentioned having arthritis pain to Dr. Al-Junaidi. She continued treatment with Dr. Al-Junaidi from March 2005 through April 2005 for high blood pressure and COPD.  On June 20, 2005, plaintiff returned to Dr. Al-Junaidi for continued knee pain.  The following month, Dr. Al-Junaidi referred plaintiff to a rheumatology specialist for possible arthritis.  During her appointment with Dr. Al-Junaidi on August 8, 2005, plaintiff complained of depression, in addition to general body aches and pain.  During the office visits with Dr. Al-Junaidi in 2005, Percocet was prescribed for pain.

Plaintiff returned to Dr. Rowe on August 11, 2005 for reevaluation of her lower extremities.  Plaintiff informed Dr. Rowe that she was being treated for rheumatoid arthritis by Dr. Al-Junaidi.  Since plaintiff had not been seen by a rheumatologist, Dr. Rowe referred her to Dr. Eric Tamesis.  Dr. Rowe also prescribed physical therapy and Vicodin and advised rest, ice, and to elevate her lower extremities for the pain.

On August 29, 2005, plaintiff had an office visit with Dr. Al-Junaidi for chronic pain, chronic depression, and COPD.  She continued to see Dr. Al-Junaidi monthly for the same symptoms.  During those visits, Dr. Al-Junaidi counseled plaintiff on smoking and alcohol cessation and prescribed either Percocet or Ultracet for pain.  In December 2005, plaintiff was hospitalized for pancreatitis. She denies any further alcohol consumption since her discharge from that hospitalization.

Plaintiff saw Dr. Rowe again on February 7, 2006 complaining of back pain.  She informed Dr. Rowe that she had not attended physical therapy due to transportation problems.  For the first time, plaintiff claimed that her neck, back, knees and hands problems were caused by a motor vehicle accident in 2000.  Dr. Rowe took AP and

lateral x-rays of her lumbar spine and AP views of her pelvis.  Moderate degenerative changes in the lumbar spine and degenerative joint disease in the hips were noted.  Dr. Rowe again advised plaintiff to attend physical therapy.  Therapy and rehabilitation reports from February 21, 2006 to March 3, 2006 indicate that plaintiff was able to walk without assistance and that her functional ability was improving.

On March 15, 2006, plaintiff was examined by Dr. Tamesis for possible rheumatoid arthritis.  Dr. Tamesis reported that plaintiff had diffuse polyarthralgis and polymyalgias, degenerative joint disease of the knees, bilateral shoulder arthropathy, and evidence of cervical and lumbar spondylosis.  He concluded that clinically plaintiff did not have rheumatoid arthritis.

On March 16, 2006, plaintiff had a third MRI of her cervical spine which revealed left lateral recess and foraminal stenosis at C3-4, compromise of the left C4 nerve root, right foraminal stenosis at C4-5 with compromise of the right C5 nerve root, a right paracentral small shallow herniation at C5-6 with mild impression on thecal sac without cord compromise, and a central broad-based shallow herniation and mild stenosis at C6-7 with bony ridge without cord compromise.

**B. Medical Evidence of Plaintiff's Mental Health**

On February 12, 2004, plaintiff began treatment with Dr. Yvette Baker, a psychiatrist.  On February 26, 2004, Dr. Baker concluded that plaintiff's increased anxiety was due to pain and stress, and prescribed Prozac and Phanargan.  During an office visit with Dr. Baker on April 1, 2004, plaintiff disturbed other patients by arriving intoxicated and was not evaluated.  On June 30, 2004, Dr. Baker's diagnosed plaintiff

as having mild to moderate depression and referred her to Judy Bradford, a therapist, for psychotherapy.

Plaintiff voluntarily entered rehabilitation at Meadow Wood Behavioral Health System for detoxification from alcohol on September 9, 2004 and was discharged on September 14, 2004.  Plaintiff's mental status exam on September 9, 2004 was normal. Upon discharge, Dr. John DeFrate noted that plaintiff had "major depression, recurrent and mild."  Her GAF score on admission was 30 and 50 at discharge, with a high of 55 in the past year.  Plaintiff continued to drink after her discharge from Meadow Wood until she was hospitalized with pancreatitis in December 2005.

On November 30, 2004, plaintiff was examined by Dr. Janis Chester of the Delaware Disability Determination Service.  Dr. Chester reported that plaintiff appeared to be a victim of abuse, was alcohol dependent, suffered from dysthymia, and had borderline intellectual functioning.  Her GAF score was listed as "currently 45 and highest in the last year is also 45."  Dr. Chester also opined that plaintiff was severely impaired in performing work which required frequent contact with others and involved complex tasks, and had a moderately severe deterioration of personal habits and an impairment to relate to others.

A psychiatric review and mental RFC assessment were also completed on December 13, 2004.  Neither assessment noted any severe limitations.  The mental RFC assessment, however, did indicate that plaintiff suffered from some moderately limited functions in understanding and remembering detailed instructions, maintaining attention, working within a schedule, completing a normal workday and workweek, working with others, and setting realistic goals.  Another psychiatric review and mental

8

RFC assessment occurred on March 24, 2005, the findings of which were generally consistent with those of December 13, 2004.

### C. The Administrative Law Hearing

#### 1. Plaintiff's Testimony

Plaintiff was represented by counsel and testified at the Administrative Law Hearing.  With respect to her education, plaintiff testified that she could write and perform basic math, but had trouble spelling.  Plaintiff also stated that she could follow a recipe, but claimed to have difficulty with comprehension.  Plaintiff explained that her prior work experience included being a deli worker, waitress, and construction flagger. She admitted to leaving her last job in 2001 due to transportation issues.

Plaintiff stated that of her numerous ailments, the most bothersome and severe was her lower back pain, followed by knee pain, carpal tunnel in her hands, neck pain, shoulder pain, and swelling in her feet.  Plaintiff indicated that she used a nebulizer four times a day at specific time intervals, and took medication for pain.  Regarding her mental status, plaintiff testified that she is under the care of Dr. Baker for depression and currently takes Prozac and Risperdal for sleep.

Plaintiff claimed that she is limited to walking and sitting for 5 to 10 minute intervals only.  Plaintiff acknowledged that she could pick up objects, such as coins, but advised that on occasion she would drop what she was holding.  In addition, plaintiff claimed difficultly with sleeping, but denied that the problem was due entirely to pain. She admitted that she cared for her father and did some cooking and cleaning at home. She testified that her boyfriend often assisted her in daily chores and moving around.

### 2. Witnesses' Testimony

Shelly Keating, plaintiff's mother, testified on behalf of plaintiff. Ms. Keating stated that she visits her daughter once a week only since plaintiff stopped drinking in December 2005. Ms. Keating's observations of her daughter's condition were mostly based on conversations with plaintiff, and her testimony often reiterated what plaintiff had described.

In addition, plaintiff's boyfriend, Joseph McGinnis, testified concerning his observations of her condition. Mr. McGinnis acknowledged that he often assisted plaintiff with household chores and helped her when her knees locked. He also stated that it was easier for him to visit plaintiff at her house because she had difficulty climbing the stairs at his residence. Mr. McGinnis provided specific instances where she had fallen or needed assistance. Mr. McGinnis also confirmed that plaintiff stopped drinking alcohol since her hospitalization in December 2005.

### 3. Vocational Evidence

The VE was present during the testimony of plaintiff and her two witnesses. At the conclusion of their testimony, the ALJ directed the VE to offer his opinion as to whether a person of plaintiff's age, limited education, and work history could be employed. In addition, the ALJ limited the hypothetical to a person who could lift and carry 10 pounds occasionally, stand or walk two hours out of an eight hour day, alternate between sitting and standing, not be exposed to extreme conditions and avoid moderate exposure to dust and fumes, follow only simple tasks and instructions, and was limited to overhead reaching. The VE stated that the limitations still permitted a person to be employed as either a charge account clerk, a callout operator, or an

10

addressor.  Both the charge account clerk and the callout operator positions were considered sedentary, unskilled jobs that required minimal education.  The addressor position was listed as clerical type work and involved mass mailings.  The VE, however, admitted that if the ALJ determined that all of plaintiff's allege ailments existed, she could not maintain any type of employment.

### D. The ALJ's Determination

On September 12, 2006, the ALJ issued his decision regarding plaintiff's claim for SSI.  After reviewing the record and the testimony of plaintiff, her witnesses, and the vocational expert, the ALJ concluded as follows:

1. The claimant has not engaged in substantial gainful activity since March 12, 2002, the alleged onset date (20 CFR 416.920(b) and 416.971 *et seq.*).

2. The claimant has the following severe impairments: osteoarthritis, carpal tunnel syndrome, cervical disc herniation, right shoulder degenerative joint disease, bilateral degenerative joint disease of the knees, degenerative joint disease of the left ankle, chronic obstructive pulmonary disease, dysthymia, borderline intellectual functioning, and a personality disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift/carry 10 pounds; stand/walk for two hours of an eight-hour workday; sit for six hours of an eight-hour workday; perform jobs allowing alternating sitting/standing at will; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; occasionally perform overhead reaching with both arms; avoid concentrated exposure to extreme temperatures, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation; perform jobs not involving hazards, heights or moving machinery; and perform jobs not requiring complex or detailed job tasks.

11

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on March 23, 1961 and is currently 45 years old, which is defined as a younger individual age 45-49 (20 CFR 41.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. The claimant does not have any transferable job skills within her mental and physical residual functional capacity (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

10. The claimant has not been under a "disability," as defined in the Social Security Act, since June 1, 2004 (20 CFR 416.920(g)), the date the application was filed.

**Jurisdiction**

Under 42 U.S.C. § 405(g), a district court has the jurisdiction to review an ALJ's decision once it becomes the final decision of the Commissioner.[3]  A decision of the Commissioner becomes final when the Appeals Council either affirms the ALJ's decision, denies review of an ALJ's decision, or when the claimant fails to appeal the ALJ's decision within 60 days after an unfavorable ruling.[4]

In the instant matter, the Commissioner's decision became final when the Appeals Council denied review of the ALJ's determination against plaintiff.  Thus, this court has jurisdiction to review the ALJ's decision.

_____

[3] 42 U.S.C. § 405(g) provides, "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action . . . brought in the district court of the United States for the judicial district in which the plaintiff resides."

[4] *See* 20 C.F.R. § 416.1455; *see also* 20 C.F.R. § 404.905.

**Standard of Review**

This court's review is limited to determining whether the final decision of the

Commissioner is supported by substantial evidence.

> Substantial evidence is less than preponderance but more than a mere
> scintilla.  It is such relevant evidence as a reasonable mind would accept
> as adequate support for conclusion.  It must do more than create a
> suspicion of the existence of a fact to be established . . . it must be
> enough to justify, if the trial were put to a jury, a refusal to direct a verdict
> when the conclusion sought to be drawn from it is one of fact for the jury.[5]

The Supreme Court has embraced a similar standard for determining summary

judgment pursuant to Fed. R. Civ. P. 56:

> The inquiry performed is the threshold inquiry of determining whether
> there is a need for a trial–whether, in other words, there are any genuine
> factual issues that properly can be resolved only by a finder of fact
> because they may reasonably be resolved in favor of either party.
> This standard mirrors the standard for a directed verdict under Federal
> Rule of Civil Procedure 50(a), which is that the trial judge must direct a
> verdict if, under the governing law, there can be but one reasonable
> conclusion as to the verdict.  If reasonable minds could differ as to the
> import of evidence, however, a verdict should not be directed. [6]
>       Overall, this test is differential and this court must give deference to
> agency inferences from facts if those inferences are supported by
> substantial evidence, even where a court acting *de novo* might have
> reached a different result.
>       Furthermore, evidence taken as a whole must be sufficient to
> support a conclusion by a reasonable person, not just the evidence
> consistent with agency's decision.
>       Thus, a single piece of evidence will not satisfy the substantiality
> test if the [Commissioner] ignores, or fails to resolve, a conflict created by
> countervailing evidence.  Nor is the evidence substantial if it is
> overwhelmed by other evidence – particularly certain types of evidence
> (e.g. that offered by treating physicians) – or if it really constitutes not
> evidence but a mere conclusion.[7]

---

[5] *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).
[6] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986).
[7] *Monsour Med. Ctr. v . Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).

Where, for example, countervailing evidence consists primarily of the claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record."[8]

Cross-motions for summary judgment are merely claims that each side alone is entitled to summary judgment.  Such apparently contradictory positions do "not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and a determination whether genuine issues of material fact exist."[9]

Moreover, "[t]he filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party."[10]

**Discussion**

The Supplemental Social Security Income (SSI) program was enacted in 1972 to assist "individuals who have attained the age of 65 or are blind or disabled" by setting a minimum income level for qualified individuals.[11]  A claimant – in order to establish SSI eligibility – bears the burden of proving that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of or not less than twelve months."[12]  Moreover, "the physical or

---

[8] *Matullo v. Brown*, 926 F.2d 240, 245 (3d Cir. 1990).

[9] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

[10] *Krups v. New Castle County*, 732 F. Supp. 497, 505 (D. Del. 1990).

[11] *See Sullivan v. Zebley*, 493 U.S. 521, 524 (1990) (citing 42 U.S.C. § 1381 (1982 ed.)).

[12] 42 U.S.C. § 423(d)(1)(A).

mental impairment or impairments must be of such severity that the claimant is not only

unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in

significant numbers in the national economy."[13]  Furthermore, a "physical or mental

impairment" is an impairment that results from anatomical, physiological, or

psychological abnormalities which are evidenced by medically acceptable clinical and

laboratory diagnostic techniques.[14]

The Social Security Administration uses a five-step sequential claim evaluation

process to determine whether an individual is disabled.[15]

> In step one, the Commissioner must determine whether the claimant is
> currently engaging in substantial gainful activity.  If a claimant is found to
> be engaged in substantial activity, the disability claim will be denied.  In
> step two, the Commissioner must determine whether the claimant is
> suffering from a severe impairment.  If the claimant fails to show that her
> impairments are "severe", she is ineligible for disability benefits.
>
> In step three, the Commissioner compares the medical evidence of
> the claimant's impairment to a list of impairments presumed severe
> enough to preclude any gainful work.  If a claimant does not suffer from a
> listed impairment or its equivalent, the analysis proceeds to steps four and
> five.  Step four requires the ALJ to consider whether the claimant retains
> the residual functional capacity to perform her past relevant work.  The
> claimant bears the burden of demonstrating an inability to return to her
> past relevant work.
>
> If the claimant is unable to resume her former occupation, the
> evaluation moves to the final step.  At this stage, the burden of production
> shifts to the Commissioner, who must demonstrate the claimant is capable
> of performing other available work in order to deny a claim of
> disability.  The ALJ must show there are other jobs existing in significant
> numbers in the national economy which the claimant can perform,
> consistent with her medical impairments, age, education, past work
> experience, and residual functional capacity.  The ALJ must analyze the
> cumulative effect of all the claimant's impairments in determining whether

_____
[13] 42 U.S.C. § 423(d)(2)(A).
[14] 42 U.S.C. § 423(d)(3).
[15] *See* 20 C.F.R. §416.920(a).

she is capable of performing work and is not disabled.  The ALJ will often seek the assistance of a vocational expert at this fifth step.[16]

If the ALJ determines that a claimant is disabled at any step in the sequence, the analysis stops.[17]

**The ALJ's Decision**

The ALJ concluded that plaintiff satisfied the first, second, and fourth steps. Since her alleged disability began in March 12, 2002, plaintiff has not engaged in any substantially gainful activity.  In addition, the ALJ found that plaintiff exhibited a number of severe impairments, both anatomical and psychological.  Plaintiff's conditions were also determined to be severe enough to prevent her from performing any past relevant work.  The ALJ considered three possible sections of 20 CFR 404, Subpart P, Appendix 1 ("Appendix 1") that plaintiff's impairments may have fallen under - musculoskeletal system (1.00), respiratory system (3.00), and mental disorders (12.00).  According to the decision, however, plaintiff's ailments did not satisfy or medically equal any of the listed impairments in Appendix 1, and plaintiff was still capable of doing certain types of unskilled, sedentary work.

A musculoskeletal disorder is defined as a "loss of function due to miscellaneous disorders of the spine with or without radiculopathy or other neurological deficits."[18] Loss of function can be established if there is a determination that an individual is unable to ambulate effectively (an extreme limitation of the ability to walk)[19] or is unable

---

[16]  *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).

[17]  *See* 20 C.F.R § 404.1520(a).

[18]  20 C.F.R. pt. 404, subpt. P, app. 1, 1.00(B)(1).

[19]  In order to ambulate effectively, section 1.00 provides that "individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living . . . . [and] have the ability to travel without companion assistance to and from a place of employment or school."

16

to perform fine and gross movements effectively (an extreme loss of function of both

upper extremities).[20]  Certain disorders of the spine may satisfy those requirements if

there is evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal

stenosis.[21]  The ALJ determined that plaintiff's medical record did not indicate the

existence of any spinal disorder that satisfied the above requirements or severe

neurological abnormalities or joint deformities.  Furthermore, the ALJ noted that two

EMG reports revealed only mild bilateral carpal tunnel syndrome.

The respiratory system of Appendix 1 includes chronic pulmonary insufficiency as

a respiratory impairment.  Specifically, COPD, due to any cause, is a listed disability

if the individual's $FEV_1$ is equal to or less than the given values.[22]  The ALJ concluded

that plaintiff has been diagnosed with COPD.  However, the ALJ determined that

plaintiff's COPD was not disabling because she was not below the given $FEV_1$ value

_____

[20] This section includes "an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities."  Effective use of upper extremities is defined as the ability to reach, push, pull, grasp, and finger.

[21] 1.04 is clear that disorders of the spine must result "in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, mainifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b."

[22] The $FEV_1$ value is dependent on an individual's height without shoes. Plaintiff's medical records indicate that she is 5 foot 7 inches, or 67 inches, tall. Therefore, the $FEV_1$ value that correlates to her height is 1.35 (L, BTPS).

and admitted to smoking cigarettes.  The ALJ pointed to the pulmonary function test performed on November 1, 2004, which listed plaintiff's $FEV_1$ at 3.42 (L, BTPS), well above the $FEV_1$ value of 1.35.

Mental disorders are divided into nine categories, including affective disorders (12.04), mental retardation (12.05), and personality disorders (12.08).  Affective disorders are diagnosed by the presence of depressive syndrome, manic syndrome, or bipolar syndrome causing at least two functional limitations or a history of a chronic affective disorder of at least two years (typically referred to as the "C" criteria).[23]  The ALJ did not find that plaintiff's diagnoses of depression, dysthymia, borderline intellectual functioning, and personality disorder severely limited any of the four functional categories.[24]  On similar grounds, the ALJ dismissed the possibility of a disabling personality disorder, which also requires a finding of marked limitation of at least two functional categories.  In addition, the ALJ concluded that plaintiff's impairments did not satisfy the "C" criteria of 12.04.   While mental retardation can be satisfied in four ways,[25] the ALJ found no evidence that plaintiff's IQ score was at 70 or below.  Therefore, the AlJ determined that plaintiff "has the mental functional ability to perform unskilled work . . . ."

As for plaintiff's RFC, the ALJ found that "the preponderance of the medical evidence" does not support a severe impairment, which would prevent plaintiff from

[23] 20 C.F.R. pt. 404, subpt. P, app. 1, 12.04.

[24] 20 C.F.R. pt. 404, subpt. P, app. 1, 12.04(B) (1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration.).

[25] Three are based on having an IQ of 70 or less while the other is determined by the claimant's dependence on others for personal needs and the ability to follow directions.

"performing unskilled sedentary work," or occur at such a severity and frequency to prevent her from working. While acknowledging that plaintiff has numerous impairments and symptoms, the ALJ concluded that she still had the "capacity to understand, remember, and carry out simple instructions and tasks and interact with other people sufficient to perform work." Based on this information and considering her age, education, and prior work experience, the ALJ accepted the VE's opinion that plaintiff was capable of finding employment as a charge account clerk, addresser, or call out operator, and found that opinion to be consistent with the entire record.

**Plaintiff's Claims**

Plaintiff makes five arguments in support of her motion for summary judgment: (1) the ALJ did not properly discuss or weight the medical opinions of the treating physician, the consulting psychiatrist, and the state medical consultants; (2) the ALJ failed to consider the testimony of her two witnesses, her mother and boyfriend; (3) the vocational hypothetical presented to the VE was improper because it did not include mental limitations; (4) the RFC determination was not supported by substantial evidence; and (5) the ALJ failed to obtain and consider missing evidence.

First, plaintiff contends that the ALJ failed to provide an adequate analysis regarding any of the treating physicians' medical opinions and did not consider several other opinions. Specifically, plaintiff argues that the ALJ did not consider either Dr. Al-Junaidi's opinion that she was "unable to work" and was disabled due to hepatitis C and COPD, or Dr. Chester's opinion that plaintiff has a severe impairment to work with others. Plaintiff also insists that the ALJ failed to adequately explain his findings and the weight assigned to the medical opinions. In response, defendant counters that the ALJ

gave appropriate weight to the physicians' opinions, consistent with the requirements of 20 C.F.R. § 416.927, and that a treating physician's conclusory statements are not entitled to any controlling weight.

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great[er] weight."[26]  Moreover, such reports will be given controlling weight where a treating source's opinion on the nature and severity of a claimant's impairment is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence on record.[27]  The ALJ must consider medical findings supporting the treating physician's opinion that the claimant is disabled.[28]  If the ALJ rejects the treating physician's assessment, he may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of *contradictory medical evidence*."[29]  However, a statement by a treating source that a claimant is "disabled" is not a medical opinion:  rather, it is an opinion on an issue reserved to the ALJ because it is a finding that is dispositive of the case.[30]  Therefore, only the ALJ can make a disability determination.

While the ALJ is required to consider all relevant evidence, "a written evaluation of every piece of evidence is not required as long as the ALJ at least minimally

[26] *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000).
[27] *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001).
[28] *Morales*, 225 F.3d at 317 (citing *Plummer*, 186 F.3d at 429).
[29] *Plummer*, 186 F.3d at 429 (emphasis added).
[30] *See* 20 C.F.R. § 416.927(e)(1).

20

articulated his analysis for that particular line of evidence."[31]  Furthermore, the ALJ does not have to cite *specific* evidence.[32]

The court finds that plaintiff's argument is misplaced.  The ALJ determined that plaintiff had a number of severe impairments and specifically mentioned Dr. Al-Junaidi's records and Dr. Chester's examination of plaintiff in support of his findings.  The actual weight given to each opinion does not affect the ALJ's conclusion that plaintiff's ailments do not meet a listed disability under Appendix 1.  In fact, neither Dr. Al-Junaidi's conclusion that plaintiff was disabled, nor Dr. Chester's finding that plaintiff had a moderate social impairment, make the existence of a listed disability in Appendix 1 more likely.

First, Dr. Al-Junaidi's conclusion does not refer to a listed disability and is not supported by the record.  The ALJ found that plaintiff's symptoms simply do not meet or medically equal any of the listed impairments to be considered disabled.[33]  Plaintiff does not allege that the ALJ failed to mention a specific impairment which would have changed his determination.  In addition, Dr. Chester's finding is not given controlling weight because it is inconsistent with the substantial evidence in the record.  The ALJ mentioned that while plaintiff may have a mild limitation to maintain social functioning, she testified that she "is able to interact with other people, including family and her boyfriend, and perform activities outside her home."  After extensive review of the

---

[31] *Brank v. Astrue*, 636 F. Supp. 2d 335, 346 (D. Del. 2009).

[32] *Id.*

[33] "Whether the findings for an individual's impairment meet the requirements of an impairment in the listings is usually more a question of medical fact than a question of medical opinion."  SSR 96-5P.  Whether the claimant meets the requirements of a listing is an issue reserved to the Commissioner.  *Id.*

record, the court finds that the ALJ properly examined each relevant section of Appendix 1 and that plaintiff's conditions do not meet a listed disability.

Plaintiff also contends that the ALJ committed an error of law by not mentioning the content of and not giving any consideration to the testimony of plaintiff's two witnesses, her mother and boyfriend. Plaintiff claims that their testimony was "clearly probative" of her functional limitations. Defendant argues that the ALJ is not required to summarize the testimony of the witnesses in making its determination, and that the ALJ's decision clearly indicates that the ALJ considered the testimony of both witnesses.

Pursuant to section 416.913(d), the ALJ is permitted to use evidence from other sources in determining the severity of a claimant's impairments and how it affects the claimant's ability to function. "Other sources" includes testimony from relatives, caregivers, and friends.[34] "Since there is a requirement to consider all relevant evidence . . ., the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence . . . allows a claimant or subsequent reviewer to follow the adjudicator's reasoning . . . ."[35] Even if the ALJ determines that the witnesses' testimony is not credible, the decision must address the testimony of each witness,[36] and give a reason for not finding a witness credible and disregarding his or her testimony.[37]

Contrary to plaintiff's assertions, the ALJ did consider the testimony of plaintiff's mother and boyfriend and provided adequate reasons for questioning their credibility.

[34] 20 C.F.R. § 416.913(d)(4).
[35] SSR 06-03P.
[36] *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 122 (3d Cir. 2000).
[37] *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983).

The ALJ correctly noted that plaintiff's mother and boyfriend testified as to the intensity, persistence and limiting effects of plaintiff's symptoms and stated that both were consistent with plaintiff's allegations.  After suggesting that their testimony may not be entirely credible, the ALJ proceeded to explain how the "preponderance of the medical evidence [did] not reflect impairments that would prevent [plaintiff] from performing unskilled sedentary work" and listed specific examples of plaintiff's capabilities. Therefore, the ALJ clearly indicated that he considered the witnesses' testimony and then thoroughly discussed the reasons for finding them not credible.

Plaintiff also contests the accuracy of the VE's opinion because the hypothetical posed by the ALJ purportedly did not include her mental limitations, namely, dysthymia, borderline intellectual functioning, and a personality disorder.  Defendant claims that the hypothetical considered plaintiff's mental impairments by limiting the jobs to those with "simple tasks and instructions."

"[A]n ALJ's hypothetical must include all of a claimant's impairments" that are supported by the record.[38]  Furthermore, the ALJ may only consider the VE's testimony if the hypothetical "accurately portrays the claimant's individual physical and mental impairments."[39]  If the hypothetical fails to properly phrase the claimant's impairments and limitations, the VE's testimony cannot be considered substantial evidence.[40] However, the ALJ "need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments."[41]

---

[38] *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004).
[39] *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002).
[40] *Ramirez*, 372 F.3d at 552.
[41] *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2000).

23

The court finds that the phrase "simple tasks and instructions" adequately accounted for plaintiff's mental limitations.  The ALJ's hypothetical was substantially supported by two RFC assessments completed on December 2004 and March 2005. While both assessments noted that plaintiff's concentration was poor, the first RFC stated that plaintiff was capable of handling "simple tasks," and the second indicated that she "could perform repetitive tasks."  Furthermore, plaintiff's intellectual limitations were only in concentration, persistence, and pace, and her impairments did not affect other functions such as "reliability, common sense, ability to function independently, and judgment . . . ."[42]  Since the VE's opinion was based on a hypothetical that properly encompassed all of plaintiff's limitations, the fifth step is supported by substantial evidence.

Plaintiff next states that the ALJ's RFC determination was not supported by substantial evidence because it did not include her social limitations, contrary to the medical opinions which suggest she is at least moderately limited in her ability to interact with others.  Defendant contends that there are numerous examples in the record which support the ALJ's RFC determination.  In addition, alcohol was a contributing factor to plaintiff's social limitations.

An RFC assessment describes a claimant's ability to perform work-related activities.[43]

> The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the

[42] *Burns*, 312 F.3d at 123.
[43] SSR 96-5P.

adjudicator determine the most reasonable findings in light of all the evidence.[44]

While medical opinions must be considered by the ALJ when determining a claimant's RFC, "the overall RFC assessment is an administrative finding . . . ."[45]

Despite medical opinions suggesting some limitation in interacting with others, plaintiff, by her own admission, testified that she has no difficulty getting along with family, friends, neighbors and others.  In fact, she admits to being well liked by her co-workers when she was employed.  Furthermore, the opinion plaintiff refers to indicates that she is capable of and does socialize, and only suggests that she "may not work well with others."  The medical record, coupled with plaintiff's statements, supports the ALJ's conclusion that plaintiff is able to "interact with other people sufficiently to perform work."

Finally, plaintiff argues that the ALJ had a duty to help her develop a complete medical history and failed to request or obtain additional records.  Defendant refutes plaintiff's contention, and notes that plaintiff bears the burden of proving her disability which includes presenting medical records and evidence.

As discussed above, the claimant bears the burden of proving she is disabled. [46] This burden includes furnishing medical records and any other relevant evidence regarding the claimant's ability to work and function.[47]  If, however, the claimant is unable to obtain the medical reports necessary for a disability determination, the

---

[44] *Id.*
[45] *Id.*
[46] 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 416.912(a).
[47] 20 C.F.R. § 416.912(a).

adjudicator will make "every reasonable effort" to obtain those records only when the claimant gives permission to request those reports.[48]

While plaintiff is correct that the ALJ has a responsibility to assist her in developing a complete medical record by requesting documents or issuing subpoenas, nothing in the record indicates that plaintiff ever requested the ALJ's assistance.  During the hearing, the ALJ granted plaintiff an extension to supplement her medical history and informed plaintiff's counsel to notify him if there were any issue in obtaining additional records.  Plaintiff does not allege that she made any further requests in retrieving those documents.  Plaintiff also fails to explain why she was unable to obtain the evidence she claims is missing from the record when she bears the burden of proving a disability exists.  Thus, the court finds that the ALJ did not fail to develop the record.

Having concluded that the ALJ's determination is supported by substantial evidence, the court recommends that plaintiff's request for an award of benefits be denied.

## ORDER AND RECOMMENDED DISPOSITION

For the reasons contained herein, I recommend that:

(1) Plaintiff's motion for summary judgment (D.I. 16) be DENIED.

(2) Defendant's cross-motion for summary judgment (D.I. 19) be GRANTED.

(3) Defendant's motion for extension of time (D.I. 18) be GRANTED.

---

[48] 20 C.F.R. § 416.912(d).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D.Del.LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b).  The written objections and response are each limited to ten (10) pages.

The parties are directed to the Court's standing Order in Non-Pro Se matters for Objections Filed under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is available on the Court's website, www.ded.uscourts.gov.

Dated: February 12, 2010                    /s/ Mary Pat Thynge
                                            UNITED STATES MAGISTRATE JUDGE